kaw

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **MARY E. OESTERLE, by and through** | ) | |
| **Sharon Stoner, Administrator of the** | ) | |
| **estate of Mary E. Oesterle,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No.  09-4010-JAR** |
| | ) | |
| | ) | |
| **ATRIA MANAGEMENT CO., LLC and A98** | ) | |
| **SENIOR, LLC, d/b/a Atria Hearthstone East,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

Before the Court is defendants Atria Management Company, LLC's and A98 Senior,

LLC's, d/b/a Atria Hearthstone East's (collectively "Atria"), Motion to Dismiss or Alternatively,

to Order this Matter to Arbitration (Doc. 4).  Plaintiff Mary E. Oesterle, by and through Sharon

Stoner, filed a Response on February 23, 2009.  The Court ordered the parties to provide

additional briefing after limited discovery.  Plaintiff filed a Supplemental Response (Doc. 23) on

May 15, 2009, and defendants have failed to respond in the time allotted.[1]  The Court has

reviewed the briefs and for the reasons provided in further detail below, Atria's Motion to

Dismiss or Alternatively, to Order this Matter to Arbitration (Doc. 4) is granted in part and

denied in part.

## I.   Relevant Facts

Atria is a registered Kentucky corporation and plaintiff was a resident of Kansas.  Sharon

---

[1]*See* D. Kan. R. 6.1(d).

Stoner, the daughter of the deceased plaintiff and administrator of plaintiff's estate, executed the agreement upon which defendants rely.  The events leading to the execution of that contract are as follows.  Stoner flew to California to escort plaintiff back to Kansas so that she could reside at defendants' facility.  Although plaintiff anticipated arriving in Kansas in January 2004, she and her daughter arrived in October 2003.  Stoner made arrangements with defendants for her mother over the phone.  On October 10, 2003, plaintiff and Stoner went to Hearthstone East to admit plaintiff.  Upon arrival, Stoner was given a stack of admission papers "on a take it or leave it basis" to sign, which she did.  Indeed, even if Stoner wanted to negotiate the provisions of the agreement, the staff in charge of explaining the terms did not have the authority to amend the agreement.  During the initial meeting no one from the defendants' facility pointed out, explained, or reviewed the meaning of the arbitration provision.

That clause provides:

> By signing this Agreement, both of us hereby agree that all claims, disputes, demands, or controversies arising out of or in any way relating to this Agreement or its breach or related to any act or omission committed by us or any of our employees in connection with any services that we may provide you while a resident of the Community will be submitted to binding arbitration in the state where the Community is located. Such Arbitration will be conducted in accordance with the rules of the American Arbitration
> Association, applying the laws of the state where the Community is located. Your agreement to arbitrate disputes arising under this Agreement or disputes arising out of or related to any services that we may provide you while a resident at the Community applies to any claim, dispute, demand or controversy, whether against the Community, its owners, operators, managers, employees, agents, officers and directors or affiliates or subsidiaries, and binds you, your legal representative, your responsible person(s), your spouse, estate and your heirs. Any award rendered by the arbitrator shall be final and binding upon each of the parties, and judgment thereon may be entered in any court having jurisdiction over the parties.

2

The costs of any Arbitration proceeding shall be shared equally by both of us. All current damages arising out of such claims or controversies shall also be incorporated into the initial filing or amendment thereto.

On both signature pages of the Residency Agreement, just above the signature lines, the following provision is written.

> You understand and agree that as a result of signing this Agreement, you agree to arbitrate any claims, disputes, demands, or controversies that you may have with the Community and that you are waiving your right to bring any such claim, dispute, demand or controversy in any federal, state or local court before any judge or jury.

When Stoner signed the papers, she believed that the arbitration provision meant that she was obligated to negotiate with the defendants prior to bringing any action in court. Indeed, that is essentially the same meaning applied to the clause by those employees of defendants who were in charge of explaining the provisions to prospective residents. The Executive Director saddled with explaining and answering any questions about the agreement thought that the arbitration provision meant that "if there was an issue between the resident and the community, that we would go to an arbitration process, if there's a grievance or an appeal that we would go to the arbitration process and at that time with arbitration the results of that would be a binding arbitration and it would be according to our state." The Community Business Director thought the arbitration provision meant "that we would go through arbitration if there's any disputes or grievances and it would be handled in arbitration and it's set to be what is decided by arbitration would be final." When asked if the signor of the agreement had the right to go to court, the Community Business Director responded that she did not know. Finally, the Regional Vice President of Operations, with authority over Texas and Kansas, thought that the arbitration

3

provision required mediation until legal action in court was necessary.  He described the

provision as requiring the parties to first mediate any action.

Plaintiff, through her estate, filed this action claiming that Atria was negligent in the care

it provided her while she was a resident of Atria, and that Atria violated the Kansas Consumer

Protection Act.  Plaintiff alleges that defendants failed to provide reasonable and adequate care

as required under common law and its contractual obligations.  As a result of defendants'

negligence, plaintiff died on November 19, 2007.

Based on the foregoing provisions, defendants filed their motion to dismiss for lack of

jurisdiction, arguing that the Court should dismiss the action or order that the parties to proceed

to arbitration.

## II.     <u>Discussion</u>

Atria moves the Court to dismiss the action for lack of jurisdiction or, alternatively, to

compel arbitration under the Federal Arbitration Act ("FAA").  State law contract principles

control when determining the enforeceability of an arbitration agreement.[2]  When evaluating

arbitration agreements under the FAA, many of the Circuit Courts of Appeal, including the

Tenth Circuit, have applied a standard similar to the summary judgment standard.[3]  That standard

provides that the moving party must first establish that there is a valid arbitration agreement.[4]

Once the moving party meets that burden, the burden shifts to the opposing party to show a

---

[2]*Hardin v. First Cash Fin. Servs., Inc*, 465 F.3d 470, 475 (10th Cir. 2006).

[3]*Id*; *see also Kuhn v. Ameriquest Mortgage Co.*, Case No. 04-2229, 2004 WL 2782568, at *1 (D. Kan. Dec. 1, 2004).

[4]*Perkins v. Rent-A-Center, Inc.*, Case No. 04-2019, 2004 WL 1047919, at *2 (D. Kan. May, 5, 2004).

genuine issue of fact as to the validity of the arbitration agreement.[5]

Plaintiff opposes arbitration, urging that: (A) the arbitration agreement is unconscionable, against public policy, and an adhesion contract; (B) there was no meeting of the minds between the parties; (C) the FAA is inapplicable to the current action because the contract does not involve interstate commerce; and (D) the scope of the arbitration provision does not encompass plaintiff's claims.

### A.    Unconscionability

"Under Kansas law, 'a party who freely enters a contract is bound by it even though it was unwise or disadvantageous to the party, so long as the contract is not unconscionable.'"[6] "Mere inequality of bargaining power is insufficient to render a contract unconscionable."[7]  To show unconscionability, the party attacking the contract has the burden to establish that there were additional deceptive bargaining practices in the execution of the agreement.[8]

In *Willie v. Southwestern Bell Telephone Co.*,[9] the Kansas Supreme Court provided a list of factors to consider in determining whether a contract provision is unconscionable.  That list includes:

> (1) The use of printed form or boilerplate contracts drawn skillfully by the party in the strongest economic position, which establish industry wide standards offered on a take it or leave it basis to the party in a weaker economic position. . . ; (2) a

---

[5]*Id*; *Hardin,* 465 F.3d at 475.

[6]*In re Universal Serv. Fund Tel. Billing Practices Litig.*, 300 F. Supp. 2d 1107, 1125 (D. Kan. 2003) (quoting *Moler v. Melzer*, 942 P.2d 643, 645 (1997)).

[7]*Id*. (citing *Aves ex rel. Aves v. Shah*, 906 P.2d 642, 652 (Kan. 1995)).

[8]*Id*. (citing *Adams v. John Deere Co.*, 774 P.2d 355, 357 (Kan. Ct. App. 1989)).

[9]549 P.2d 903 (Kan. 1976).

significant cost-price disparity or excessive price; (3) a denial of basic rights and remedies to a buyer of consumer goods. . . ; (4) the inclusion of penalty clauses; (5) the circumstances surrounding the execution of the contract, including its commercial setting, its purpose and actual effect. . . ; (6) the hiding of clauses which are disadvantageous to one party in a mass of fine print trivia or in places which are inconspicuous to the party signing the contract. . .; (7) phrasing clauses in language that is incomprehensible to a layman or that divert his attention from the problems raised by them or the rights given up through them; (8) an overall imbalance in the obligations and rights imposed by the bargain; (9) exploitation of the underprivileged, unsophisticated, uneducated and the illiterate. . . ; and (10) inequality of bargaining or economic power.[10]

In addition, the court must find that the contract provision is so outrageous and unfair in its wording or its allocation that it shocks the conscience.[11]  Any finding of unconscionability must be accompanied by some element of deceptive bargaining conduct as well as unequal bargaining power.[12]

Plaintiff contends that the arbitration clause was unconscionable because it was boilerplate language skillfully drawn by defendants' attorneys; the arbitration provision denies plaintiff the basic right to access the courts; the arbitration agreement penalizes the plaintiff by requiring that each party pay half of the arbitration fee; the circumstances surrounding the execution of the agreement pressured plaintiff into signing the agreement; the arbitration language is incomprehensible to the layman; and there was inequality of bargaining power between the parties.

---

[10]*Santa Rosa KM Assocs., Ltd. v. Principal Life Ins. Co.*, 206 P.3d 40, 50 (Kan. Ct. App. 2009) (citing *Willie*, 549 P.2d at 906-07).

[11]*Adams*, 774 P.2d at 357.

[12]*Id.* at 359.

6

Each claim that a contract or a clause is unconscionable rests on the facts of that particular case.[13]  In this case, plaintiff's arguments appear to suggest that the arbitration clause is procedurally unconscionable.  Generally, a contract is procedurally unconscionable when a party enters the contract lacking knowledge or lacking voluntariness.[14]  Plaintiff's first argument that the arbitration clause is a skillfully drawn boilerplate provision is unfounded.  The agreement is laid out in twelve pages, four pages of which are signature or attachment pages. Each section of the contract is labeled in capitalized numbered headings.  The heading under which the arbitration provision lies is labeled "7. MISCELLANEOUS PROVISIONS."  Under that section, the arbitration provision is found at sub-section "j."  The arbitration provision is written in the same font and size as every other provision in the agreement.  It is not hidden or lost to the reader.

Plaintiff argues that the language of the arbitration clause is boilerplate because it refers to the state where the Community is located rather than to Kansas.  That, however, does not aid plaintiff in showing that the clause is unconscionable because there is no dispute that the agreement was a form contract drafted for the purposes of being valid in every state in which defendant operated.  Even if the Court were to view that the arbitration clause was written in the contract under a list of boilerplate provisions, this factor alone would not be enough to find the clause unconscionable.[15]

Next, plaintiff argues that the Arbitration clause denies plaintiff the right to access the

---

[13]*John Deere Leasing Co. v. Blubaugh*, 636 F. Supp. 1569, 1573 (D. Kan. 1986).

[14]*Id.*

[15]*Id.* (noting that the cases suggest that there must be additional conduct such as deceptive bargaining practices).

courts, an essential remedy of a consumer.  That is correct.  Again, however, that is the purpose

of the arbitration clause.  That alone is not enough to find the clause unconscionable.[16]  In

addition, plaintiff argues, without citation, that the arbitration provision places a penalty on

plaintiff because it requires her to pay half the arbitration fees.  A party seeking to invalidate an

arbitration provision based on prohibitive cost bears the burden to show that arbitration would be

cost prohibitive.[17]  Plaintiff must provide evidence of costs associated with arbitration that are so

high as to prevent access to the forum and the likelihood of incurring those costs.[18]  In this case,

the Court finds the fee-splitting aspect of the Arbitration clause valid.

In *Shankle v. B-G Maintenance Managemnt of Colorado, Inc.*,[19] the Tenth Circuit found a

fee-splitting provision unenforceable because it worked as a disincentive to employees who

wanted to bring a claim.[20]  In that case, the Court determined that fee-splitting arbitration was

unenforceable because plaintiff, who was a janitor and signed the arbitration provision as a basis

for employment, could not reasonably afford the fee-splitting of any claim that went to

arbitration.[21]  The arbitration provision in that case was supposed to serve as an optional route to

vindicate the statutory rights provided plaintiff as an employee.[22]  Where the arbitration

provision did not aid in vindication, but actually prohibited, the forum was not adequate for

---

[16]*Id.*

[17]*Green Tree Fin., Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000).

[18]*Id.*

[19]163 F.3d 1230 (10th Cir. 1999).

[20]*Id.* at 1234.

[21]*Id.* at 1235.

[22]*Id.* at 1234.

resolution of plaintiff's rights.[23]

In this case, however, the contract is not one for employment.  And although it is a contract on a take it or leave it basis, plaintiff could have left it.  Moreover, the Court in *Shankle* found it important that plaintiff was seeking to enforce a statutory claim of employment discrimination.  But here, plaintiff is bringing a tort claim.  Plaintiff is not enforcing any statutory right for which the arbitration clause would serve as a disincentive or operate to stifle public policy.  In that sense, the fee-splitting provision is enforceable.  Furthermore, plaintiff has not provided any evidence of the costs associated with arbitration.  Without any evidence before the Court, it cannot find that the cost is prohibitive.

Finally, plaintiff argues that there was an inequality of bargaining power and that the circumstances surrounded the execution of the contract show that the arbitration provision is unconscionable.  Plaintiff argues that because she was forced by the circumstances to seek a place of resident for her mother sooner than anticipated and because she had to sign the papers the day she arrived at the care facility, there was pressure and a "hurried" nature to the execution of the agreement.  Furthermore, she argues because no one explained the provisions to her and because it was later determined that the parties who had the authority to explain the arbitration provision showed a general lack of knowledge of its actual effect, the provision should be deemed unconscionable.

As a general rule, a party signing a contract is required to read the agreement.[24]  If an agreement is signed, the Court does not second guess the provisions where a party failed to read,

---

[23]*Id.*

[24]*Albers v. Nelson*, 809 P.2d 1194, 1197 (Kan. 1991).

understand, or ask the appropriate questions.[25]  In this case, plaintiff wants the Court to second guess the provisions because she was "hurried" into signing the provisions.  But, the Court notes that the hurried nature of the proceedings leading to the execution of the contract was not created by the defendant but by circumstances under the control of plaintiff.  In fact, plaintiff states that she felt hurried because she had to complete the arrangements for home care sooner than anticipated and because her mother recently arrived from California.  Moreover, plaintiff did not ask for clarification of the arbitration provision or the consequences of signing the contract and agreeing to the arbitration provision.  And while there appears to be inequality of bargaining power, that alone, based on the circumstances of this case, is not enough to invalidate the arbitration provision.

###    B.    Meeting of the Minds

For there to be a binding contract, there must be a meeting of the minds on all the essential terms of the agreement.[26]  "'To constitute a meeting of the minds there must be a fair understanding between the parties which normally accompanies mutual consent and the evidence must show with reasonable definiteness that the minds of the parties met upon the same matter and agreed upon the terms of the contract.'"[27]  In *Navair v. IFR Americas, Inc.*,[28] the Tenth Circuit stated:

> The element of agreement is sometimes referred to as a "meeting of the minds."  The parties to most contracts give actual as well as

---

[25]*Id.*

[26]*Steele v. Harrison*, 552 P.2d 957, 962 (Kan. 1976).

[27]*Price v. Grimes*, 677 P.2d 969, 974 (Kan. 1984) (quoting *Steele*, 552 P.2d at 962).

[28]519 F.3d 1131 (10th Cir. 2008).

apparent assent, but it is clear that a mental reservation of a party to a bargain does not impair the obligation he purports to undertake.  The phrase used here, therefore, is "manifestation of mutual assent."[29]

The court then went on to provide that "[t]ypically, judicial opinions stating the meeting-of-the-minds principle then point to objective communications and conduct in resolving the case."[30]  All contracting parties have a duty to learn the contents of a written contract before signing it, "and such duty includes reading the contract and obtaining an explanation of its terms."[31]  "[A] party who signs a written contract is bound by its provisions" absent fraud, undue influence, or mutual mistake.[32]

Plaintiff argues that there was no meeting of the minds when the parties executed the agreement because plaintiff did not know that the arbitration clause obligated her to arbitrate all claims and forego her access to the courts and defendants' representatives also did not believe that the arbitration clause required binding and final arbitration.  However, when determining whether there was a meeting of the minds, the courts generally look to the agreement; a signed agreement is usually evidence that the parities met on the terms on the agreement.[33]  Here, there is a signed agreement by both parties.  Moreover, plaintiff's subjective thoughts of what the provisions meant did not come into play because they were never revealed to defendants at the

---

[29]*Id*. at 1139 (quoting RICHARD A. LORD, WILLISTON ON CONTRACTS § 4:1 (4th ed. 2007)).

[30]*Id*.

[31]*Albers v. Nelson*, 809 P.2d 1194, 1197 (Kan. 1991) (citing *Sutherland v. Sutherland*, 358 P.2d 776, 785 (1961)).

[32]*Id*. (citations omitted).

[33]*Id*.

11

time of execution.[34]   Accordingly, the Court finds that the parties entered into a contract and had

a meeting of minds on the terms of that contract.

> ### D.       *Interstate Commerce*

Plaintiff argues that the FAA is inapplicable because defendants are not engaged in

interstate commerce; instead, the nursing home is merely an intrastate operation.   As noted

above, defendants have not replied to plaintiff's supplemental response and accordingly, have

not addressed this argument.   The FAA applies to all arbitration agreements involving interstate

commerce.[35]   The requirement that the underline transaction must involve interstate commerce

"'is to be broadly construed so as to be coextensive with congressional power to regulate under

the Commerce Clause.'"[36] According to the Supreme Court, the FAA reaches physical shipment

of goods and any contract relating to interstate commerce.[37]   The term "involving" has been

understood to mean "affecting" interstate commerce, giving the FAA a wide web based on

Congress's Commerce power.[38]   When determining whether the arbitration provision falls under

the FAA, the Court must determine whether the transaction at issue in fact involves interstate

commerce.[39]

---

[34]*Id.* at 1198. (Citing *Triple A Contractors, Inc. v. Rural Water Dist. No. 4*, 603 P.2d 184, 186 (Kan. 1979) (noting that as general rule, "in the absence of fraud, a unilateral mistake will not excuse nonperformance of a contract.")).

[35]*Comanchie Indian Tribe of Okla. v. 49, L.L.C.*, 391 F.3d 1129, 1131 (10th Cir. 2004).

[36]*Id.* at 1132 (quoting *Foster v. C.F. Turley, Jr.*, 808 F.2d 38, 40 (10th Cir. 1986)).

[37]*Id.* (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S.395, 401 n.7 (1967)).

[38]*Allied-Bruce Terminex Companies, Inc. v. Dobson*, 513 U.S. 265, 281 (1995).

[39]*Id.*

Plaintiff cites to *Bruner v. Timberlane Manor Limited Partnership*[40] as support for its proposition that the transaction at issue does not involve interstate commerce.  In *Bruner*, the Oklahoma Supreme Court decided that the contract between a resident and a nursing home did not involve interstate commerce.  Even though the facility received Medicaid and Medicare benefits from the federal government pursuant to Congress's spending power, used out-of-state vendors, used instruments of interstate commerce, and complied with federal regulations, it did not engage interstate commerce.[41]  The Court reasoned that the Medicare funds did not have a substantial effect on interstate commerce and neither did the distribution of Medicaid funds from a state agency.[42]

In *Bruner*, the parties were both from Oklahoma.[43]  In this case, plaintiff was a resident of California prior to entering the care of defendants in Kansas, and defendants are a Kentucky corporation.  And although diversity alone will not meet the test,[44] the Court believes that the instant contract involves interstate commerce.  First, Plaintiff claims that other than the defendants being a registered corporation in Kentucky, there is less evidence of involvement in interstate commerce than in *Bruner*.   But that is belied by the fact that plaintiff moved from California to reside in the facilities in Kansas.  And second, unlike *Bruner*, fees paid to defendant are transactions in interstate commerce where defendant is a Kentucky corporation

---

[40]155 P.3d 16 (Okla. 2006).

[41]*Id.* at 31.

[42]*Id.*

[43]*Id.*

[44]*Biomat Inc. v. Sampson*, 15 P.3d 846, 849 (Kan. Ct. App. 2000) (citing *Sigco Sunplant, Inc. v. Harrison*, No. 89-2229-0, 1989 WL 134462 (D. Kan. Oct 18, 1999)).

and plaintiff was a resident of Kansas.  Even assuming that the fee transactions might have taken place entirely in Kansas, the reach of the FAA is not defeated by the fact that, taken alone, the transaction did not have a substantial effect on interstate commerce.[45]

"Interstate commerce is involved so long as some part of the transaction has a nexus to it."[46]  In this case the nexus is clear.  Furthermore, it is obvious that while the facility at issue operated in Topeka, plaintiff's form contract referred to the "laws of the state where the Community is located," leading the to Court believe that the form contract was used in other states.  Otherwise, the contract would have referred specifically to "Kansas."  Finally, plaintiff asserts as uncontested, facts derived from the deposition of defendants' regional vice president of operations.  This vice president has routine oversight of the Texas and Kansas regions.  The company is a Kentucky corporation, and it operates in Texas and Kansas.  Based on those facts, the Court finds that the contract at issue does involve interstate commerce.

### E.      Scope of Arbitration Clause

Plaintiff argues that the arbitration clause at issue was not intended to cover "pre-dispute consumer health care liability."  Specifically, plaintiff states that because the arbitration provision references the American Arbitration Association ("AAA"), which provides that it will not "accept administration of cases involving individual patients without a *post-dispute* agreement to arbitrate" after January 1, 2003, the arbitration provision is not applicable to the instant claims.[47]  According to plaintiff, because the agreement was signed on October 10, 2003,

---

[45]*Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (citations omitted).

[46]*Baer v. Terminex Int'l Co.*, 975 F. Supp. 1272, 1278 (D. Kan. 1997).

[47]American Arbitration Association, Healthcare Policy Statement, available at http://www.adr.org/sp.asp?id=32192 (hereafter Healthcare Policy Statement).

14

and revolves around a *pre-dispute* arbitration clause, the arbitration provision does not
encompass any claim made.

Federal policy favors arbitration agreements and requires rigorous enforcement of
arbitration provisions.[48]  The FAA creates a presumption of arbitrability and when faced with
issues about the scope of an arbitration provision, courts must resolve any doubt in favor of
arbitration.[49]  "District courts defer to arbitration 'unless it may be said with positive assurance
that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute
. . . doubts should be resolved in favor of coverage.'"[50]  "While courts favor arbitration, the
parties' intent and the scope of the arbitration clause dictate whether arbitration is appropriate."[51]
It is up to the court to determine whether the clause is broad or narrow.[52]

The arbitration clause at issue states that

> all claims . . . arising out of . . . this Agreement . . . or omission
> committed by us or any of our employees in connection with any
> services that we may provide you while a resident of the
> Community will be submitted to binding arbitration in the state
> where the Community is located.  Such Arbitration will be
> conducted in accordance with the rules of the American
> Arbitration Association, applying the laws of the state where the
> Community is located.

The language of the provision makes clear that all claims, whether contract or tort, will be

---

[48]*Housh v. Dinovo*, No. 02-2562, 2003 WL 1119526, at *2 (D. Kan. Mar. 7, 2003) (citing *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987)).

[49]*Housh*, 2003 WL 1119526, at *2 (citing *Moses H. Cone Mem'l Hosp. v. Mecury Constr. Corp.*, 460 U.S. 1, 24-5 (1983)).

[50]*Trezvant v. Weston*, No. 04-1246, 2006 WL 2370121, at *2 (D. Kan. 2006) (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)).

[51]*Id.* (citing *Armijo v. Prudential Ins. Co. of Am.*, 72 F.3d 793, 797 (10th Cir. 1995)).

[52]*Id.* (citation omitted).

submitted to binding arbitration and conducted according to the rules of the AAA.  By policy statement, the AAA provides that: "As a result of a review of its caseload in the health care area, the American Arbitration Association has announced that it will no longer accept the administration of cases involving individual patients without a *post-dispute* agreement to arbitrate.  In order to provide sufficient notice for an orderly transition, this change will become effective on January 1, 2003."[53]

The agreement in this case is dated October 10, 2003, after January 1, 2003.  Thus, according to the plaintiff, the parties are not subject to arbitration unless there is a *post-dispute* agreement to arbitrate.  In this case there is only a *pre-dispute* agreement to arbitrate.  The Court, however, reads the language differently.

The arbitration provision provides that all claims will "be submitted to arbitration in the state where the Community is located."  It then goes on to state that any arbitration will be "conducted in accordance with the rules of the [AAA]."  What is apparent from the language of the arbitration provision is that the parties intended that Kansas law apply—referring to the law of the Community's location—and that the arbitration be conducted in accord with AAA rules.  The obstacle is reconciling the arbitration in accordance with AAA when AAA states that it will not accept arbitration of individual health care claims where there is no post-dispute agreement to arbitrate.

In a factually similar case, the Supreme Court concluded that even though the arbitration provision provided that New York law would apply, that did not mean that the arbitrators could

---

[53]Healthcare Policy Statement (emphasis added).

not award punitive damages.[54]  In *Mastrobuono v. Shearson Lehman Hutton, Inc.*, the plaintiffs

sued alleging a variety of state and federal law claims.[55]  The claims were sent to arbitration

based on an arbitration provision that provided that New York law governed and that arbitration

would be conducted in accordance with the rules of the National Association of Securities

Dealers ("NASD").[56]  New York, however, did not permit arbitrators to award punitive damages,

but NASD permitted arbitrators to award punitive damages.[57]

In reconciling the obvious conflict, the Court, noting the strong federal policy in favor of

arbitration, concluded that the arbitrators could award punitive damages.[58]  A similar conclusion

is warranted here, where the arbitration provision is ambiguous.  This conclusion is consistent

with the FAA.  Plaintiff argues that the AAA rules would preempt an arbitration provision under

the FAA.  But this conclusion is untenable as the FAA preempts state law.  Therefore, finding

that the FAA preempts AAA policy is a conclusion this Court can comfortably recognize.[59]

Guided by the Supreme Court, this Court finds that the appropriate way to construe the

arbitration provision is to read it as simply requiring arbitration in accordance with AAA rules

---

[54]514 U.S. 52, 64 (1995).

[55]*Id*. at 55.

[56]*Id*. at 58-59.

[57]*Id*. at 53, 62.

[58]*Id*. at 62.

[59]See *Volt Info. Sci., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)
(noting that the FAA preempts state law); *Perry v. Thomas*, 482 U.S. 483, 491 (1987) (concluding that the FAA
preempts California law).

and not AAA policy.[60]  Thus, the AAA provision covers the rules to abide by when conducting

the arbitration, while AAA policy on the types of arbitrable claims is simply just that—AAA's

policy.[61]  And while plaintiff argues that her reading of the provision is the correct one, "'such a

result would be quite inimical to the FAA's primary purpose of ensuring that private agreements

to arbitrate are enforced according to their terms.'"[62]  Indeed, the parties may contractually limit

the issues that they will arbitrate and may specify the rules to govern any such arbitration.[63]

There is nothing in the FAA that prevents parties from enforcing arbitration provisions under

different rules than those in the FAA.[64]  Where the parties have decided to arbitrate in

accordance with AAA rules, enforcing that decision is certainly consistent with the FAA.[65]

        Accordingly, defendants' motion to compel arbitration is granted and the action will be

stayed pending such arbitration.

        **IT IS THEREFORE ORDERED THAT** defendants' Motion to Dismiss or

Alternatively, to Order this Matter to Arbitration (Doc. 4) is granted in part and denied in part.

The action will be stayed pending arbitration.

        **IT IS SO ORDERED.**
Dated:  July 14, 2009

---

[60]"We think the best way to harmonize the choice-of-law provision with the arbitration provision is to read 'the laws of the State of New York' to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators."  *Mastrobuono*, 514 U.S. at 63-4 (quoting the arbitration clause at issue).

[61]The Court notes that the parties can pursue arbitration based on AAA rules but not administer the arbitration process through AAA.  This would also be a consistent reading of the arbitration provision.  *See id.*

[62]*Id.* at 57 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)).

[63]*Id.* (citing *Volt Info. Sci., Inc.*, 489 U.S. at 479).

[64]*Volt Info. Sci., Inc.*, 489 U.S. at 479.

[65]*Id.*

18

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE